474 P.2d 196

**Robert C. ROLLETTE, Appellant,**

v.

**Charles A. MYERS and Evelyn M. Myers, husband and wife, Appellees.**

**No. I CA–CIV 1148.**

Court of Appeals of Arizona, Division 1, Department B.

Sept. 14, 1970.

Rehearing Denied Oct. 15, 1970.

Review Denied Dec. 1, 1970.

Carson, Messinger, Elliott, Laughlin & Ragan, by Robert W. Holland, Phoenix, for appellant.

W. T. Elsing and Moore, Romley, Kaplan, Robbins & Green, by Craig R. Kepner, Phoenix, for appellees.

JACOBSON, Judge.

On this appeal we are primarily asked to determine whether the trial court properly allowed the introduction of income tax returns of a corporation in which plaintiff was a stockholder as bearing on the issue of reduction of earning capacity of the plaintiff.

This case is now making its second trip through the appellate courts of this state. On the first appeal by defendants, Charles A. Myers and Evelyn M. Myers, this court affirmed a judgment in favor of a plaintiff, Robert C. Rollette, in the sum of $79,379.-00, as remitted by the trial court from a jury verdict of $130,000.00. *See* Myers v. Rollette, 6 Ariz.App. 43, 429 P.2d 677 (1967). On review, the Supreme Court reversed the judgment of the trial court on the issue of future medical damages and remanded for a new trial solely on the issue of damages. *See*, Myers v. Rollette, 103 Ariz. 225, 439 P.2d 497 (1968).

The second trial in this matter resulted in a jury verdict in plaintiff's favor in the sum of $1,000.00. From a judgment entered for this amount, the plaintiff now appeals.

The underlying fact situation giving rise to the basic cause of action by plaintiff has been adequately set forth in the Supreme Court decision in this case, and need not be restated here. The specific factual predicate giving rise to the primary issue on this appeal and not discussed in either

the prior Court of Appeals or Supreme Court decisions is as follows.

Plaintiff-appellant herein was injured in 1961. Thereafter he developed and patented a process whereby a colored paint could be placed upon crushed rock to be used as a lawn substitute and decorative device. In order to produce and market this product, plaintiff together with his brother in 1963, formed a corporation known as Colored Lawn Stone, Inc. The initial capitalization of the corporation consisted of $20,000.00, plaintiff and his brother each contributing $10,000.00. Plaintiff was made president and treasurer of the corporation and his brother became vice president and secretary. Stock in the corporation was equally divided between plaintiff and his brother.

Within two or three months after the corporation became operative, plaintiff and his brother loaned an additional $18,000.00 to the corporation. Additional loans in the sum of $13,500.00 were made to the corporation by a local banking institution. These loans were guaranteed by the two stockholders.

From the evidence it appears plaintiff was mainly concerned with the mechanical end of the operation which at least in the formative period of the corporation was its principal function, and his brother handled the financial affairs of the corporation. Plaintiff also engaged in soliciting orders for the corporation. In addition to plaintiff and his brother, the corporation initially employed two or three workmen and truckdrivers.

The perfection of the process of coloring the crushed rock was a continuing one which apparently came to fruition in 1966. During this perfection period, the corporation was engaged in producing and selling the colored stone itself. To this end a plant was built in Phoenix, Arizona, and in Puerto Rico.

In October, 1966, the corporation sold its Phoenix plant and engaged from that time on in a franchising business, moving its principal office to South Beloit, Illinois.

The franchising business consisted of building and selling the patented machinery and paint to others who actually produced and sold the finished stone products. At the time of trial, the corporation apparently had 45 franchise dealers and the physical building of production plants was done by C. & M. Steel Company of Phoenix, Arizona. The patented gravel coating is manufactured to the corporation's specifications by an independent paint supplier. The corporation has never declared a dividend nor paid plaintiff any salary.

Plaintiff at the time of trial introduced evidence to show that because of his physical injuries, he was unable to engage in his previous occupation as a heavy equipment operator. Plaintiff also introduced evidence of the current wages of heavy equipment operators in an attempt to show damages arising out of a future loss of earning capacity. Defendant, in an attempt to offset this evidence, and show that plaintiff in fact suffered no diminution of earning capacity introduced evidence showing plaintiff was receiving wages after the accident from a company known at Strasburg Lumber and Fuel Company, ranging from $11,000.00 to $18,000.00 per year. Plaintiff had received wages from this company prior to his injuries and no objection to this evidence was made.

Defendant also offered into evidence the federal income tax returns of Colored Lawn Stone, Inc., for the years 1963 through 1967.

These returns showed that Colored Lawn Stone, Inc. had a net taxable income for these years as follows:

| | |
|---|---|
| 1963 | $ 72.46 |
| 1964 | 19,959.66 |
| 1965 | 20,022.66 |
| 1966 | 45,625.92 |
| 1967 | 24,743.43 |

Defendant also offered into evidence the financial statements of Colored Lawn Stone, Inc. filed with the Arizona Corporation Commission for the same years. The last of these financial statements in-

dicated the corporation had cash on hand of over $72,000.00 and an earned surplus of over $84,000.00.

Plaintiff objected to the introduction of the income tax returns and the financial statements on the grounds that the net income or assets of the corporation did not bear any relationship to the earning capacity of the plaintiff and were speculative and immaterial on any issue of damages in the case.

The trial court admitted both the income tax returns and the financial statements of the corporation. After their introduction, defendant was able to argue to the jury on the issue of damages for loss of earning capacity as follows:

"I think we can fairly assume through the years he has made this money and hasn't received a salary but it's still there. The total of these amounts I think for those four and a fraction years is about $190,000.00. If he got only half of it.

\* \* \*

"Now, let's take a look at Exhibit 95. The last page of that exhibit is a return signed by him and his brother. It is signed before a Notary Public, sworn to and it shows the total liability, just about $15,000.00. And they show the amount of deposits in the sum of $72,884.14. So that doesn't hold water. He could have been paying a salary and when this lawsuit is over tomorrow they probably could pay him a salary and half of it retained, the total of $84,000.00 retained and half of it at least is his.

\* \* \*

"You have many, many, many thousands of dollars that he's been earning, and I don't complain of his earning money, I hope it continues and I think we can believe from the evidence he will. That's all well and good, but don't come into court and try to collect from these people that I represent and that's who he's trying to collect from. Don't try to collect from them claiming you have lost earnings when in truth and fact

you haven't but the earnings are much more than they were at the time of the accident. If he had stayed with the heavy equipment industry he wouldn't have made this kind of money, ladies and gentlemen.

"I say in all seriousness that he really has not had any loss of earnings or any loss of earning capacity, either."

Plaintiff raises on appeal whether the trial court erred in admitting the income tax returns showing net profit and the financial statements showing earned surplus of the corporation.

■ The measure of damages for loss of *earning capacity* is the difference between what an injured person was capable of earning before the accident and injury and what he is capable of earning after the injury. City of Phoenix v. Mubarek Ali Kahn, 72 Ariz. 1, 229 P.2d 949 (1951). However, the formula for arriving at damages for loss of earning capacity is not necessarily the difference between plaintiff's earnings before the injuries and those after, but rather the loss of earning capacity itself which, under some circumstances, might decrease, although actual earnings increase. Anthes v. Anthes, 258 Iowa 260, 139 N.W.2d 201 (1965); Gonzalez v. Hoffman, 9 Mich.App. 522, 157 N.W.2d 475 (1968); *See* Phelps Dodge Corporation, Morenci Branch v. Ind. Comm., 90 Ariz. 379, 368 P.2d 450 (1962).

■ The fact that the injured plaintiff at the time of trial is able, however, to make more money than he did prior to his injury is material as to the extent of his damages in terms of diminution of earning capacity. Boodry v. Byrne, 22 Wis.2d 585, 126 N.W.2d 503 (1964); *See* Ianni v. Grain Dealers Mutual Insurance Co., 42 Wis.2d 354, 166 N.W.2d 148 (1969).

With this latter purpose in mind, defendant sought the introduction of the corporate income tax return. Here, however, defendant was confronted with another problem, that is, the relationship of corporate profits to individual earning capacity.

■ The general rule, vis-a-vis corporate profits and individual earning capacity, is that if the injured plaintiff makes a *substantial* showing that his own services, efforts and initiative, rather than capital invested, or labors of others, is the predominant factor producing the profits of the business, then loss of these profits can be shown, but only as an aid in determining the pecuniary value of plaintiff's services in the business. Kennard v. Kaelin, 58 Wash.2d 524, 364 P.2d 446 (1961); Bischoff v. Dodson, 405 S.W.2d 514 (Mo. App.1966); Greyhound Lines, Inc. v. Duhon, 434 S.W.2d 406 (Tex.Civ.App. 1968); and 10 Blashfield's Cyclopedia of Automobile Law and Practice § 6465 at 63 (Perm.ed.1955).

■ Thus, to make the loss of the profits of a business material to the issue of earning capacity, it must be shown that these profits are so allied to the personal efforts of the injured party that profits are a reflection or a near reflection of that party's earning capacity.

While the cases cited above dealt with plaintiff's proof of diminution of earning capacity and counsel has not cited to this court, nor has the court on its own research found any reported cases where a defendant has attempted to use profits of a business in which the injured plaintiff had an interest to show that in fact plaintiff suffered no loss of earning capacity, we can find no logical reason for not allowing the defendant, if the proof justifies the same, to introduce such evidence.

In this case, however, we hold that defendant's proof of the relationship between plaintiff and the corporate entity does not show that plaintiff's personal efforts were the predominant factor in producing the profits of the corporation. Here, the corporation in a relatively short period of time received capital of approximately $51,500.-00 from various sources. Presumably this capital went into producing the machinery and perfecting the process of coloring crushed stone. The record is silent as to how much of the subsequent profit of the corporation is attributable to this capital investment. In addition to plaintiff's labors on behalf of the corporation, plaintiff's brother and two or three other workmen at the inception of the corporation contributed labor to the corporate entity. Again, how much of the profits of the corporation is attributable to their services is a matter of speculation. During the taxable year 1966, when the corporation showed its greatest profit, the corporation sold its Phoenix plant for $37,500.00, which was reflected in the corporate income for that year. This sale consisted of machinery, trucks, equipment, office furniture and office equipment. Obviously, the sale of this tangible personal property does not bear any relationship to the plaintiff's personal services to the corporation.

Following the sale of the Phoenix plant, the corporation engaged in a franchising business, its principal income being derived from the sale of production plants and paints, which were manufactured or produced by others. What these items produced by way of income to the corporation as compared to plaintiff's service to the corporation is again a speculative matter.

■ We therefore hold the trial court erroneously allowed the introduction of the profits of this corporation as bearing either on the issue of plaintiff's loss of income or loss of earning capacity. To determine whether such introduction was prejudicial, we need only turn to counsel's argument to the jury equating profits of $190,000.00 in four years by the corporation with actual income to the plaintiff. It was prejudicial.

We do not mean to indicate that an injured plaintiff through his ownership in a closely-held corporation can hide the value of his services to the corporation through the expediency of not drawing a salary from that corporation. The value of plaintiff's services to Colored Lawn Stone, Inc. is a material and valid factor in determining plaintiff's diminished earning capacity. The point of inquiry is, however, the value of the services, not the profits

earned by the corporation. In this regard, the profits earned by the corporation may be material when placed in the context of a foundationally framed hypothetical question to a properly qualified expert in order for such an expert to give his opinion as to the value of plaintiff's services.

To reiterate, however, the raw corporate profits in this case do not materially reflect the earning capacity of the plaintiff.

As to plaintiff's claimed error in instructions on contributory negligence we find that the trial court did not overemphasize this portion of the case. As our decision in this matter requires a reversal and a new trial we need not consider the other issues raised by plaintiff.

The judgment of the trial court is reversed with directions to grant plaintiff a new trial on the issues specified in the Arizona Supreme Court decision of Myers v. Rollette, *supra*.

EUBANK, P. J., and HAIRE, J., concur.